## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:24-cr-00161-RDP** |
| | } | |
| **HARMEL DEANNE CODI** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on Defendant Harmel Deanne Codi's Motion to Dismiss the Criminal Indictment Against the Defendant. (Doc. # 32). The court held three hearings on the Motion: the first on April 14, 2025, the second on September 22, 2025, and the third on October 10, 2025. (*See* Docs. # 44, 77, 81). The Motion is now fully briefed and ripe for review. (Docs. # 32, 37, 38, 64, 83, 84, 85, 86).

Based on certain stipulations entered into by the parties, Defendant's motion turns on two questions: first, whether the United States has satisfied its burden of showing that there is a compelling government interest in enforcing the Controlled Substances Act by prosecuting Defendant; and second, whether the United States has satisfied its burden of showing that this prosecution is the least restrictive means of achieving its compelling interest.  For the reasons discussed below and with the benefit of oral argument, the court concludes the Government has made both showings and Defendant's Motion (Doc. # 32) is due to be denied.

## I.    Background

### A.    General Background

On February 1, 2024, a package from Peru addressed to "Mel Mason" at a Post Office Box in Shelby County, Alabama was intercepted by the Customs and Border Protection ("CBP"). (Doc. # 37 at 2). Inside the package was a substance that contained dimethyltryptamine ("DMT") (*id.*), a Schedule I controlled substance regulated by the Controlled Substances Act. 21 U.S.C. § 812.

DMT is found in ayahuasca, which is "a sacramental tea made from two plants unique to the Amazon region." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 425 (2006).

Homeland Security Investigations ("HIS") began an investigation and determined that "Mel Mason" was an alias used by Defendant Codi (her first name is Harmel and her maiden name was Mason), and that Defendant was the registered user of the post office box to which the package was addressed. (Doc. # 37 at 2). Investigators replaced the substance containing DMT with brown sugar and a tracking device, and on March 19, 2024, Defendant retrieved the package from the post office box. (*Id.* at 2-3). As she was returning home to Georgia, investigators pulled her vehicle over and apprehended her. (*Id.* at 3). Defendant told law enforcement that she was a "shaman" and could lawfully possess DMT. When told that she could not lawfully do so, she responded, "has the law ever been tested?" (*Id.*).

Investigators later learned that Defendant was operating a website on behalf of her church, the "Temple of Umi." (*Id.*). The church is registered in Georgia and Defendant is its principal agent. (*Id.*). Agent Parker noted that the website explains that "shamanism" is not "confined to specific religious doctrines." (*Id.*). The website also states that some retreats "operate legally under religious exemptions" and that ayahuasca retreats "may be in a legal grey area." (*Id.*).

Agent Parker then contacted the Drug Enforcement Agency's ("DEA") Diversion Control Program ("DCP") to determine whether Defendant or the Temple of Umi had applied for a DEA DCP Certificate.[1] (*Id.* at 4). The DEA DCP program reviewed their files and concluded that neither had obtained such a certificate. (*Id.*).

---

[1] Holders of valid DEA DCP certificates may legally possess and distribute controlled substances in certain limited circumstances.

On April 25, 2024, a grand jury returned an indictment against Defendant, charging her with violating 21 U.S.C. §§ 846, 841(a)(1), and (b)(1)(C), which prohibit possession of a controlled substance with intent to distribute and conspiring to do so. (Doc. # 1 at 1). On May 16, 2024, Defendant appeared before the Honorable John H. England where she was advised of her rights and the charge against her. (Minute Entry, May 16, 2024).

Defendant filed her Motion to Dismiss (Doc. # 32) on January 31, 2025, asserting that the indictment is due to be dismissed because the charge violates her rights under the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb ("RFRA"), the First Amendment, and the Equal Protection Clause. (*Id.* at 1-2, 18-28). Defendant asserts that (1) the Drug Enforcement Agency lacks jurisdiction to decide RFRA claims or defenses (*id.* at 7-10), (2) her attempt to possess with intent to distribute DMT – or a substance containing DMT – is a sincere exercise of religion that has been substantially burdened by the indictment (*id.* at 10-16), and (3) this prosecution does not further a compelling governmental interest and is not the least restrictive means of furthering any such interest (*id.* at 16-18). She also contends that this prosecution is evidence of selective prosecution of African American women and women in general, in violation of the Equal Protection Clause. (*Id.* at 18-28).

In support of her motion to dismiss (Doc. # 32), Defendant filed three expert reports and a personal affidavit. (Docs. # 32-1, 32-3, 32-5). One expert indicates that ayahuasca is a traditional Amazonian brew made from the Banisteriopsis caapi vine (which contains Harmine) and the Psychotria viridis leaf (which contains DMT) and has been used for centuries in indigenous religious ceremonies across South America. (Doc. # 32-1 at 2). The report further explained that ayahuasca is considered a sacrament that facilitates spiritual healing, communion with the divine, and personal transformation. (*Id.*). In recent decades, according to the expert, ayahuasca has been

adopted by various religious communities, including those in the United States, as a legitimate tool for spiritual growth and religious expression. (*Id.*).

A second expert opined that ayahuasca is a "traditional psychoactive admixture or brew" that is prepared by combining leaves of a plant containing DMT with bark or stems from a vine that makes the DMT orally active. (Doc. # 32-3 at 2). The expert opined that "[r]esearch suggests that ayahuasca may safely and rapidly reduce symptoms of depression, anxiety, and post-traumatic stress disorder," that ayahuasca "is not considered addictive" because it "does not cause compulsive use or withdrawal symptoms," and that "many users report . . . gastrointestinal discomfort and distress (*e.g.*, nausea, vomiting, diarrhea) [that] deter frequent use." (*Id.*). The expert noted that some individuals could adopt "problematic use patterns" and that potential risks include "acute episodes of anxiety and paranoia," exacerbating "symptoms of psychotic and bipolar disorders," elevating the heart rate and blood pressure, and interaction with antidepressants. (*Id.* at 2-3). The expert also noted that properly trained facilitators could make "use in ceremonial settings . . . generally safe." (*Id.* at 3). The expert also opined that he believed Defendant is sincere in her religious beliefs regarding ayahuasca and that her practices are generally safe. (*Id.*). Specifically, the expert explained, Defendant is a leader and member of a religious community that uses ayahuasca as a sacrament, and her participation in ceremonies involving the brew is an exercise of religious freedom. (*Id.*).

A third expert reports that after interviewing Defendant, it was the expert's view that she is a "serious spiritual leader engaged in careful religious practice with Ayahuasca tea used as a sacrament, as it is used in South America. She has been well trained in the Amazonian Shipibo Ayahuasca indigenous traditional use of Ayahuasca group spiritual healing by skilled teachers in South America." (Doc. # 32-5 at 2). The expert added that "Codi's sister is a registered nurse practitioner who medically and psychologically screens Ayahuasca retreat participants for Ms.

Codi," and that "[a] medical provider is always present during Ayahuasca sessions. Ms. Codi herself is a respiratory therapist." (*Id.*). The expert also noted that Defendant requests donations from "[e]ach patient" at the ayahuasca ceremonies but that "those who cannot pay are still served." (*Id.*). The expert concluded, based on a forty-five-minute interview of Defendant, that "[Codi] is sincere, well trained and utilizes all the safety measures expected in psychedelic therapy and ceremonies." (*Id.* at 3).

Defendant herself provided an affidavit. In that declaration, she wrote that "I am deeply committed to my spiritual journey and ministry," that she has completed a Master's in Divinity from the Interdenominational Theological Center (Doc. # 32-6 at 2), and that she began her "shamanic practice" after experiencing postpartum depression and functional depression. (*Id.* at 3). Defendant also wrote that her "Temple" was established in late 2020 and that "[t]hrough quarterly retreats, regular services and supportive meetings, our Temple provides a place of healing, support, and fellowship for all who seek it." (*Id.* at 4). Defendant's affidavit continued that she began her "journey into shamanic practice" in Peru "[u]nder the guidance of elders and teachers from the Shipibo community." (*Id.*). Defendant also wrote that her "church" provides "shamanic retreats and services three to four times a year on a not-for-profit basis," and that participants contribute to "cover essential costs such as accommodations, food, lodging, activities, and workshops." (*Id.* at 6). Defendant described that her church's "mission is to foster spiritual development and healing," that "[i]ndividuals attending our ceremonies must be active members of our healing circle," (*id.* at 7), and that the church either required or strongly encouraged members to follow certain dietary and behavioral regimes in the weeks leading up to a ceremony. (*Id.* at 7-8).

Defendant received what she says were "random text messages" from an unknown number, as well as emails from the mail office, about a package dispatched from Peru on January 25, 2024

and addressed to "Mel Mason," which she noted was "a name not typically associated with any orders sent to me from outside the country." (*Id.* at 10). Defendant traveled to Birmingham on March 19, 2024, picked up a few packages at the post office (including the one addressed to Mel Mason), and was pulled over and arrested based on "probable cause . . . for trafficking DMT." (*Id.*).

The court held a hearing on April 14, 2025, but it quickly became clear that it would not be possible to complete the hearing in the allotted time. (Doc. # 44 at 44). During that hearing, the parties set forth their respective arguments and stated what they believed their evidence would establish in this case. A key point of contention at the hearing was the use of DMT and ayahuasca – and even the ceremonies in which they are used – by non-religious individuals, as well as whether Temple of Umi was marketing to non-religious users. (Doc. # 44 at 49).

Defendant filed a supplemental brief on September 2, 2025. (Doc. # 64). In the supplemental brief, Defendant argues that Temple of Umi's website and promotional materials are proselytization, which is protected by the Free Exercise Clause. (*Id.* at 6-8). Further, Defendant contends that the use of words like "healing," "mental health," and "medicine" are consistent with religious practice. (*Id.* at 8-11). Defendant also claims that ayahuasca use is limited to the Temple of Umi and therefore, the concern about extra-ceremonial distribution is low. (*Id.* at 13). Along with the supplemental briefing, Defendant included an amended expert report that opined that there is "no 'street' market for ayahuasca" and that any profit made by the church was likely used to offset "large overheads and small profit margins." (Doc. # 62-4 at 3-4).

**B.    Hearing Testimony**

Across three days of hearing testimony, the court heard from three witnesses who testified for the Government and four witnesses who testified for Defendant. The Government called Special Agent Senior Brandon May, retreat-attendee Lyrik Merlin, and Homeland Security Special

Agent Jonathan Parker. Defendant called Dr. Peter Hendricks, church member Tim DeYoung, and Dr. Brad Stoddard. Defendant Harmel Codi also testified. Before the second hearing, the parties stipulated that the court could – for the purposes of the hearing – assume without deciding that Defendant is able to establish a prima facie case under RFRA. As such, the only issues left to be decided at this stage based on the hearing testimony were (1) whether the government had a compelling governmental interest in enforcing the Controlled Substances Act against Defendant and (2) whether the criminal prosecution of Defendant was the least restrictive means of achieving that interest. Still, a significant portion of the hearing testimony was focused on other parts of the RFRA test and counterarguments to points that were not raised by the opposing side. The court very briefly summarizes the relevant portions of the hearing testimony (and notes that there was a significant amount of testimony unrelated to the Government's burden).

Due to previously scheduled travel obligations, the court took the presentation of evidence out of order and heard Dr. Hendricks's testimony before hearing from the Government's witnesses. Dr. Peter Hendricks, a Professor at the University of Alabama Birmingham ("UAB") whose research focuses on the use of psychedelics, testified on behalf of Defendant. Dr. Hendricks's testimony was primarily focused on the health and safety of ayahuasca use and Defendant's stated practices. His testimony was based on his research about DMT, ayahuasca, and other psychedelics, as well as conversations he had with Defendant.

The first Government witness was Special Agent Senior Brandon Maye. He was the primary agent investigating this case on behalf of the Alabama State Bureau of Investigations. He explained the impetus of the investigation, as well as the process of controlled delivery that led to Defendant's arrest. He also testified that he was not personally aware of any instances of distribution of ayahuasca outside of the context of her church activities. And, he stated that his Department began its investigation after CBP intercepted a package containing 2 kilograms of

DMT being sent to a post office box in Birmingham addressed to Mel Mason. (Doc. # 77 at 71:8-72:15).[2]

Lyrik Merlin then testified on behalf of the Government. Merlin is a nurse who has received specialized training in the use of psychedelics. (*Id.* at 116:6-117:7). However, his testimony at the hearing focused on his participation in the retreats held by Defendant. He met Defendant in 2022 when he signed up for an ayahuasca retreat with her church. (*Id.* at 118:20-24). He testified that he is not a member of any religion that expresses its faith through the ingestion of ayahuasca and had attended the retreats for purely non-religious reasons, including for treatment of his PTSD. (*Id.* at 118:25-119:4, 119:8-15, 121:4-7). He stated that he believed Temple of Umi to be a legitimate and legal ayahuasca distributor and did not believe that he was barred from participating in the retreats, even though he did not practice a particular religion. (*Id.* at 126:4-19). Merlin stated that while at his first retreat, Defendant claimed that there was a DEA exemption process for ayahuasca but that there was a backlog in applications due to COVID and that bringing in more members of the church would help to expedite the application. (*Id.* at 144:5-13). Merlin testified that he volunteered at two more retreats, and even attended a retreat in Peru with his wife. (*Id.* at 148:24-149:7, 150:18-151:4).[3]

Jonathan Parker, a Special Agent with HSI, was the next to testify. Special Agent Parker was the HSI Agent assigned to this case after receiving information about the package from CBP. (*Id.* at 186:11-17). He testified that the only way to consume ayahuasca legally is through DEA's diversion program, and that permission can be obtained in two ways: through the exemption process or by filing a lawsuit in federal court and asking a court to order DEA to provide an

---

[2] When citing to the evidentiary hearing transcripts, the court cites to the document number and page number as it appears in the CM/ECF system.

[3] Merlin also testified about negative experiences he had with Defendant during and after the Peru retreat. However, the relevant testimony for the purposes of this hearing is that there was never a required religiosity for consumption of ayahuasca through Defendant or the Temple of Umi.

exemption. (*Id.* at 188:12-25). He also testified that the Temple of Umi had added language about the religious nature of the ceremonies after the first evidentiary hearing. (*Id.* at 196:16-197:6). Parker noted that the Temple of Umi's operations remained ongoing amidst the investigation and prosecution of Defendant. (*Id.* at 201:20-202:14). Parker was the last of the Government's witnesses.

Next to testify was Tim DeYoung. DeYoung is a member of the Temple of Umi, having first attended a retreat in April 2022. (Doc. # 81 at 4: 7-10). He claimed that he found the Temple on Google, attended two retreats as an attendee, and then began volunteering. (*Id.* at 4:19-5:5). He testified that he first attended the Temple of Umi to help him with alcoholism. (*Id.* at 5:9-11). He then described a typical ceremony, which would include several rituals, spiritual music, meditation, and affirmations. (*Id.* at 12:18-13:6). He testified that Defendant determines the correct dosage of ayahuasca for each attendee after being guided by "the spirit," the medical intake form, and a consultative prayer with a Peruvian psychologist. (*Id.* at 15:11-16:2). He indicated that attendees are monitored at all times and are not allowed to leave once they are under the influence of ayahuasca. (*Id.* at 13:11-23). He stated that he never looked into whether the Temple of Umi or Defendant had the proper authority to handle and distribute DMT. (*Id.* at 33:21-34:1). He also noted that the website never mentioned you had to be a religious practitioner to attend the retreats. (*Id.* at 35:4-7).

Testifying next for Defendant was Brad Stoddard, a professor of religious studies at McDaniel College. His research focuses on the "entheogenic"[4] use of psychedelics, including ayahuasca. (*Id.* at 42:24-43:8). By extension, Dr. Stoddard has also become familiar with the

---

[4] Dr. Stoddard defines "entheogen" as the term people use when referring to "the sacramental or religious use of a 'drug.'" (Doc. # 81 at 43:6-8).

litigation landscape surrounding psilocybin and ayahuasca churches in the United States.[5] Dr. Stoddard testified that the language surrounding "healing" found on the Temple of Umi website is not evidence of non-religious use, but indicative of the religiosity of the Temple because nearly every religion has some healing component. (*Id.* at 68:24-70:20). He also stated that the Temple of Umi's policy of not requiring participants to subscribe to a particular religion to participate in ayahuasca ceremonies is not uncommon, even among churches that have been granted legal exemptions. (*Id.* at 65:23-67:2). Dr. Stoddard acknowledged that there are processes available to legally handle and distribute ayahuasca, but stated that they are cost-prohibitive and slow-moving. (*Id.* at 88:8-89:19, 92:13-15).

The Government, in response to further questioning from the court, revealed that Defendant had been offered a plea agreement which would allow for pre-trial diversion and tolling of the Speedy Trial Act so long as she took the steps to obtain permission to legally handle DMT – either by filing a lawsuit or applying for a DEA exemption. (*Id.* at 93:23-95:3). Defendant had been given that offer as recently as a week before the hearing and rejected the offer each time it was presented. The Government argues this shows that prosecution is the least restrictive means necessary because Defendant was provided with a reasonable, less restrictive alternative, but rejected it. In the conversation with the court, Defense counsel indicated that he would represent Defendant in the civil process and that that was her preference. (*Id.* at 95:9-22).

At that point in the hearing, Defendant opted to testify herself. Before she took the stand, the court clarified with both the Government and Defense counsel the scope of Defendant's

---

[5] Dr. Stoddard has submitted an expert report in this case. Consistent with the discussions during the evidentiary hearing, the court only considers the portions of his report that are relevant to determining the Government's compelling interest and whether the prosecution of Defendant is the least restrictive means. The court will not consider legal conclusions offered by Dr. Stoddard.

testimony in an effort to limit Defendant's testimony to only what was relevant for the purposes of the hearing.

In her testimony, Defendant detailed her and her family's long history with ayahuasca and ritualistic practices. (*Id.* at 114:4-116:2). She described how she started the Temple of Umi in 2016 with a small group of about five people. (*Id.* at 116:6-117:14). She testified that she knew about the DEA exemption process at that time and paid an attorney $3,500 to file an amicus brief on behalf of the church that she believed would be a step towards being able to legally possess and distribute ayahuasca. (*Id.* at 117:15-118:1). She also testified that she had never filed for a DEA application and never claimed she did so. (*Id.* at 130:20-25). She testified that her church was almost always operating "in the red" and she often used her own money to sustain operations. (*Id.* at 131:4-7). Upon questioning from the Government, Defendant acknowledged that she did change the language on the website after the first hearing in this case. (*Id.* at 145:20-22).

After multiple days of hearing testimony, the parties submitted cross-briefs and cross-replies that reiterate their respective positions. (Docs. # 83, 84, 85, 86). The Government contends that they have made their showing under RFRA, arguing that there is a compelling governmental interest in preventing the diversion of DMT to non-religious users and that this prosecution is the least restrictive means possible, particularly in light of Defendant's refusal to avail herself of the legally recognized processes for exemption. Defendant argues that the Government has not met its burden because Defendant's practices do not implicate any purported governmental interest and, even if they did, there are narrower alternatives to enforcing the government's interest.

## II.     Legal Standard

Federal Rule of Criminal Procedure 12 allows a defendant to bring a pretrial motion challenging a criminal indictment. Fed. R. Crim. P. 12(b)(3). A court may dismiss a criminal indictment that is legally insufficient. *See* Fed. R. Crim. P. 12(b)(3)(B); *United States v. Durrett*,

524 F. App'x 492, 494 (11th Cir. 2013) (per curiam); *United States v. Schmitz*, 634 F.3d 1247, 1260 (11th Cir. 2011); *United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987). An indictment is defective if it alleges a violation of an unconstitutional statute. *United States v. Brown*, 715 F. Supp. 2d 688, 689-90 (E.D. Va. 2010); *see The Civil Rights Cases*, 109 U.S. 3, 8-9 (1883).

The Religious Freedom Restoration Act ("RFRA") provides that the Government "shall not substantially burden a person's exercise of religion" unless it can demonstrate that its action "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling interest." 42 U.S.C. §§ 2000bb-1(a)-(b). The "exercise of religion" under RFRA must be given the same broad meaning as set forth in the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq. See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 696 (2014). To establish a *prima facie* RFRA claim, a party must show that (1) she was exercising (or seeking to exercise) her sincerely held religious belief, and (2) that the Government substantially burdened her religious exercise. *United States v. Grady*, 18 F.4th 1275, 1285 (11th Cir. 2021) (citing *Davis v. Gladden*, 777 F.3d 1198, 1204 (11th Cir. 2015)). If Defendant has proven the *prima facie* RFRA claim, the burden then shifts to the Government to prove that (1) it has a compelling interest and (2) the Government action in question is the least-restrictive means of furthering that interest. *Id.* To be clear, RFRA may be raised as a defense in a criminal prosecution. *See id.*; 42 U.S.C. § 2000bb-1(c).

The Eleventh Circuit has held that "[a] defendant asserting that she was selectively prosecuted must show 'that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *United States v. Brantley*, 803 F.3d 1265, 1271 (11th Cir. 2015) (quoting *United States v. Jordan*, 635 F.3d 1181, 1188 (11th Cir. 2011) (in turn quoting *United States v. Smith*, 231 F.3d 800, 808 (11th Cir. 2000))). "In other words, a criminal defendant

who claims she was subjected to selective prosecution must establish two elements: (1) the discriminatory effect prong of this test requires a showing that 'similarly situated individuals were not prosecuted,' and (2) '[t]he discriminatory purpose prong requires that the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'" *Id.* (internal quotations removed). A defendant asserting this defense faces a "'demanding' burden" of proving each element by clear evidence. *United States v. Smith*, 231 F.3d 800, 807-08 (11th Cir. 2000) (quoting *United States v. Armstrong*, 517 U.S. 456 464 (1996)).

## III.    Discussion

Defendant moves to dismiss the indictment, arguing that her prosecution violates RFRA and is unconstitutional under the Equal Protection Clause. (Doc. # 32). In support of her RFRA argument, Defendant relies primarily on *Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418 (2006), *Church of Holy Light of Queen v. Mukasey*, 615 F. Supp. 2d 1210 (D. Or. 2009), *O Centro Espirita Beneficiente v. Ashcroft*, 342 F.3d 1170 (10th Cir. 2003), and various expert reports about the use of psychedelics and ayahuasca that are attached as exhibits to her Motion. Defendant also argues that the Drug Enforcement Agency ("DEA") is without jurisdiction to decide RFRA claims or defenses. In support of her Equal Protection Clause argument, Defendant relies primarily on the standard for selective prosecution articulated in *Brantley*. 803 F.3d 1265. The court evaluates Defendant's RFRA and Equal Protection Clause challenges, in turn.

### A.    RFRA

As already noted and consistent with the parties' stipulations, the court assumes without deciding that Defendant has satisfied her burden of showing that her religious practice is sincere

and that this prosecution is a substantial burden on that practice.[6] The court analyzes the arguments set forth by the parties below in that light but its decision hinges on the second portion of the RFRA test. The court concludes that the Government has satisfied its burden of showing that its regulatory regime is the least restrictive means of achieving a compelling government interest.

> 1.    Defendant **has not** demonstrated that the DEA lacks jurisdiction to decide RFRA claims or defenses.

Defendant first argues that the DEA lacks jurisdiction to decide RFRA claims or defenses. This appears to be a preemptive response to an anticipated argument that Defendant should have applied to the DEA for a religious exemption rather than waiting to challenge her indictment. As the court directly addresses the merits of Defendant's RFRA defense below, it only briefly analyzes her argument about DEA jurisdiction.

Defendant's argument mainly rests on the idea that DEA judgments about RFRA's application are non-binding on courts. (*See* Doc. # 32 at 8). Therefore, she argues, her failure to file a petition for exemption with the DEA should not bar her from being able to assert a RFRA defense to her indictment. At the hearing, Defendant testified that she was aware of the DEA exemption process and had even retained counsel for the purpose of seeking legal authority to distribute ayahuasca. (Doc. # 81 at 117:15-118:1). However, she ultimately did not seek or obtain that legal authority.

---

[6] The Eleventh Circuit has found that a belief was sincere and religious when a plaintiff pleaded that it had a "clearly defined religious mission," that the belief "is an integral component of [that] mission," and that the religious exercise in question was practiced frequently. *Cambridge Christian Sch., Inc. v. Fla. High Sch. Ath. Ass'n*, 942 F.3d 1215, 1247 (11th Cir. 2019). The Supreme Court has cautioned "that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim." *Employment Division, Dep't of Hum. Res. v. Smith*, 494 U.S. 872, 887 (1990). Thus, the court assumes without deciding that Defendant has met her exceptionally low burden under this prong. Likewise, the Government's prosecution of Defendant totally prevents her from possessing, distributing, or consuming ayahuasca, which she has represented is a core tenant of her religious beliefs and practices. The court assumes without deciding that this constitutes a substantial burden on the exercise of her religious practices.

A significant portion of the evidentiary hearing was spent presenting evidence about whether the DEA process was feasible from both a financial and practical perspective. However, Dr. Stoddard agreed that the DEA exemption was a legally recognized process for authorization under which other ayahuasca churches operate; in fact, two authorizations were granted in the last year. (*Id.* at 91:10-92:15). It is clear that the DEA has jurisdiction to implement the CSA's regulatory regime for Schedule I substances, which in this case includes evaluating exemptions for religious exercise. *See* 21 U.S.C. § 811. Here, Defendant did not invoke the DEA exemption process at all, so she has no standing to argue that in a hypothetical world (in which she may have filed for a DEA exemption) that she would be injured by the allegedly non-binding nature of the DEA's determination. The court need not further evaluate this argument.

> **2.**   **The Government <u>has</u> satisfied its burden of showing that there is a compelling government interest in enforcing the Controlled Substances Act against Defendant.**

Defendant argues that the Government cannot show that there is a compelling government interest in enforcing the Controlled Substances Act against her. (Doc. # 32 at 16-18). The court disagrees. The Government has shown there is a compelling interest in preventing the diversion of DMT to secular users because, based on the evidence presented during the evidentiary hearing, there is a realistic probability and historical evidence of such diversion. (Doc. # 37 at 8). And, after thoroughly reviewing all available evidence, the court concludes that the Government has a compelling interest in enforcing the Controlled Substances Act against Defendant.

"RFRA expressly adopted the compelling interest test 'as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972).'" *Gonzales*, 546 U.S. 418, 431 (quoting 42 U.S.C. § 2000bb(b)(1)). "In each of those cases, [the Supreme] Court looked beyond broadly formulated interests justifying the general applicability of government mandates and scrutinized the asserted harm of granting specific exemptions to particular religious claimants."

*Id.* In *Gonzales*, the Supreme Court held that the Government had failed to show a compelling interest because it broadly stated that compelling interest as the exceptionally dangerous nature of Schedule I substances such as DMT. *Id.* at 432-39.

Here, the Government has defined its compelling interest as preventing the diversion of DMT to secular users. The Government presented evidence at the evidentiary hearing that the Temple of Umi is a business open to the public, with a nominal sign-up process. There was also evidence that emphasizes the non-religious benefits of ayahuasca and ayahuasca ceremonies put on by the Temple. In addition, the Government presented evidence that participants in the ayahuasca consumption ceremonies are not screened for their religious beliefs and thus it is easy for secular participants to obtain DMT at these ceremonies.

Defendant contests this characterization, arguing that "all those who received Ayahuasca through [Defendant] were required to remain with the group throughout a whole weekend retreat, with no one leaving the ceremony site with ayahuasca (DMT) in their possession." (Doc. # 38 at 16). Defendant also asserts that the "Sacrament" has an "experiential nature" and thus that many first-time participants could not be screened for sincerity before they have had the chance to experience ayahuasca and form beliefs about it. (*Id.* at 16-17). But, Defendant's argument is undercut by the fact that the two witnesses (one called by the Government and the other by Defendant) who attended Temple of Umi retreats both testified that they sought out the retreats – and consumption of ayahuasca – for non-religious purposes.[7]

Despite the changes made in recent months to the Temple of Umi's website (that occurred after the alleged offenses' conduct), the court remains of the opinion that, given the nature of the Temple of Umi's operations, the open sign-up process for ayahuasca retreats, and the direct

---

[7] As previously noted, Merlin sought out Defendant's ayahuasca retreat to help with PTSD (Doc. # 77 at 118:25-119:4, 119:8-15, 121:4-7), while DeYoung sought the retreats to help with alcoholism (Doc. # 81 at 5:10-11).

evidence of diversion, the Government has demonstrated a compelling interest in preventing diversion of DMT to secular users.

> **3.     The Government has also satisfied its burden of showing that a complete prohibition on Defendant's religious exercise is the least restrictive means of achieving its compelling interest.**

The next question is whether the Government's prosecution of an ayahuasca user, who has not obtained a DEA exemption, is the least restrictive means of furthering that compelling governmental interest.

The least restrictive means standard is "exceptionally demanding" and requires the Government to show that no less restrictive alternative could achieve the same objectives. *Hobby Lobby*, 573 U.S. at 728. To satisfy this standard, the Government must show "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties." *Id.*

The Government argues that "prohibition is the only way to ensure that Codi does not provide DMT to secular users." (Doc. # 37 at 9). This is so because, the Government argues, the Temple of Umi "is designed to appeal principally to people who wish to consume DMT for non-religious reasons," and Defendant is aware of the DEA religious exemption process but refused to use it. (*Id.* at 9-10). Therefore, the Government argues that, even if it had notified Defendant of the DEA exemption option, she would not have taken advantage of it because she already knew about it and did not do so. (*Id.*).

Defendant argues that there is no mandate that a religious practitioner seek a DEA exemption to engage in such religious exercise. (Doc. # 38 at 13). She further argues that the court should analyze the risk of diversion by evaluating the existence of an illicit market, the presence of marketing or publicity, the form of the substance, and the cost and opportunity for diversion. (*Id.* at 18). Because the Government has not proffered any expert testimony about the risk of

diversion based on these factors, Defendant argues, "the balance must tip in favor of [her] RFRA defense." (*Id.* at 19). Additionally, Defendant argues, there is no illicit market for ayahuasca, the Government has not presented any evidence of her widely marketing her ayahuasca-based activities, ayahuasca is a bulky paste or liquid and thus not easily concealable, and no diversion ever occurred because participants never left during the weekend-long retreats. (*Id.*). Defendant further argues that there are several pharmacological equivalents to ayahuasca that are "mostly void of the emetic side effects inherent in the consumption of Ayahuasca." (*Id.* at 20).

At the hearing, the only two attendees to testify – Merlin for the Government and DeYoung for Defendant – testified that they sought out and engaged in Defendant's ayahuasca retreat for non-religious purposes. Thus, Defendant's argument that there is no risk of diversion is belied by the record evidence. The question then becomes whether there are less restrictive alternatives to the Government's prosecution of Defendant. As previously noted, at any point before the commencement of this prosecution, Defendant could have applied for a DEA exemption or brought a civil lawsuit seeking legal recognition. However, even after this case took shape, Defendant was again offered that less restrictive path. The Government proposed to Defendant a pre-trial diversion agreement whereby the charges against Defendant would not be prosecuted while Defendant either applied for a DEA exemption or filed a civil lawsuit to obtain recognition. The Government stated that this offer had been made to Defendant on at least two occasions (and as recently as October 2025). Defendant rebuffed these offers each time.

The evidence presented reveals several points. First, there are at least two established avenues to consume and distribute ayahuasca legally – an approved DEA exemption or a successful civil lawsuit. Second, Defendant was aware of these options but chose not to pursue them. Third, Defendant continued her ayahuasca operation as if she had obtained proper legal authority to possess and distribute ayahuasca. Finally, even after indictment, when the Government

offered a diversion program that would suspend this prosecution while Defendant pursues the appropriate legal avenues, Defendant refused. Defendant's repeated refusal to avail herself of accessible legal alternatives[8] leaves the Government with little choice but to continue this prosecution to advance their compelling interest.

After thoroughly reviewing all available evidence, the court concludes this prosecution of Defendant is the least restrictive means of achieving its compelling interest.

### B.    Selective Prosecution

Defendant argues that the Government's prosecution of her is selective because "there is a clear pattern of the federal government failing to prosecute similarly situated ayahuasca-based religious practitioners who are male and Caucasian or Latino." (Doc. # 32 at 18-19). Specifically, Defendant points to the following cases to support her argument: *Soul Quest Church of Mother Earth, Inc. v. Attorney General*, 92 F.4th 953 (11th Cir. 2023), *Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418 (2006), *Church of Holy Light of Queen v. Mukasey*, 615 F. Supp. 2d 1210, 1218-19 (D. Or. 2009), *Iowaska Church of Healing v. Wefel*, 105 F.4th 402 (D.C. Cir. 2024), *Kamentsa Inga Church-Soul of the Hummingbird, Inc., et al. v. Merrick Garland, et al.*, Case No. 4:23-cv-04173 (S.D. Tex. 2023), and *The Church of the Eagle and Condor, et al. v. Merick Garland, et al.*, Case No. 2:22-cv-01004 (D. Ariz. June 9, 2022). Defendant also points to the prosecution of two white females in North Carolina courts to argue that the "government" is selectively prosecuting "female ayahuasca-based practitioners." (Doc. # 32 at 20-21).

Defendant draws on these cases, and particularly the *Soul Quest* case, to argue that the federal government has treated white and Latino male ayahuasca-based practitioners more

---

[8] There was testimony at the evidentiary hearing about the difficulty of obtaining a DEA exemption and the cost associated with finding an attorney to file a civil suit. However, this evidence is mitigated here in light of Defense counsel Lake's statement that he would represent Plaintiff in a civil lawsuit filed in the Northern District of Georgia to obtain proper legal status. (Doc. # 81 at 95:23-96:8).

favorably by conducting civil (rather than criminal) proceedings to ensure compliance. (Doc. # 32 at 22-25). Defendant's counsel also emphasizes that he "is unaware of any case wherein the [federal] Government has criminally prosecuted an ayahuasca-based religious practitioner" apart from the current proceedings. (*Id.* at 22).

Defendant has not come close to bearing her demanding burden of establishing both prongs of the test for selective prosecution. First, she has not shown by clear evidence that similarly situated individuals were not prosecuted. The Eleventh Circuit has defined "similarly situated" as a person:

> who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant – so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan – and against whom the evidence was as strong or stronger than that against the defendant.

*Smith*, 231 F.3d at 810. Although Plaintiff cites this string of cases listed above and includes some details about these cases, she does not explain whether or how the individuals in those cases "engaged in the same type of conduct" as she did, nor does she offer any analysis of the strength of the evidence against those individuals. Defendant has therefore not met her burden of showing *clear* evidence that these individuals were similarly situated.

Second, Defendant has not satisfied the second prong of the test for selective prosecution. She focuses on her assertion that the Government has prosecuted practitioners who are male and of different races than Defendant. (*See* Doc. # 32 at 18-20 (generally discussing non-prosecution of other practitioners); *id.* at 20-21 (highlighting prosecution of two Caucasian female practitioners); *id.* at 21-22 (again highlighting non-prosecution of other practitioners); *id.* at 22-25 (focusing on non-prosecution of Soul Quest practitioners). But, she does not offer evidence, much less clear evidence, that the prosecutorial decisions regarding these individuals were "in part because of, not merely in spite of, [their] adverse effects upon an identifiable group." *Brantley*,

803 F.3d at 1271. This is especially so because these cases were all prosecuted in different districts than Defendant's prosecution (meaning that there were different decision-makers handling the prosecutorial decisions), and because the broad span of years indicates that they took place under different Justice Department administrations.

Each of these facts further distances the current prosecutorial decision-makers from those involved in the cases that Defendant lists. Indeed, Defendant's only argument on this point is wholly conclusory. She contends, without any record support, that the Government is "rely[ing] on an unconstitutional prosecution of an African-American female as a means of providing further deterrent value against African-American communities engaging in the same religious practices." (*Id.* at 27). This does not satisfy the requirement that she present clear evidence to establish both elements of a selective prosecution claim.

## IV. Conclusion

For these reasons, the court finds by a preponderance of the evidence that although Defendant has shown that she has a sincerely held religious belief in consuming and distributing ayahuasca, the Government has carried its burden under RFRA to show a compelling government interest and that its current enforcement against Defendant is the least restrictive means of furthering that interest. Defendant also has not carried her burden of pleading a selective prosecution claim. Therefore, Defendant's Motion to Dismiss the Criminal Indictment (Doc. # 32) is due to be denied.

A separate order consistent with this memorandum opinion will be entered.

**DONE** and **ORDERED** this February 2, 2026.

R. DAVID PROCTOR
SENIOR U.S. DISTRICT JUDGE